### Oakford & Fahnestock v. John Fischer, Assignee.

1. CORPORATIONS—*Failure of Directors of, to Record Their Action.*— That the board of directors of a corporation made no record of their action does not affect the validity of a sale of personal property duly authorized by them.

2. SAME—*Certain Acts of Officers of, Held Binding on the Corporation.*—A chattel mortgage was executed by the secretary and manager of a corporation by the written consent of all the directors of the corporation, and a note and a mortgage given to secure it were assigned by the secretary and manager with the approval of the president. *Held*, that these acts were binding on the corporation.

3. VOLUNTARY ASSIGNMENTS—*Property Not in Possession of the Assignee, Not Under the Jurisdiction of the County Court.*—Assets which have not been reduced to possession by an assignee are not within the jurisdiction of the County Court, and it can not order them surrendered to the assignee, on the filing, by the person in possession of them, of a petition against the assignee in regard to another matter.

4. SAME—*Preferences After Assignment Has Been Decided on—Rights of Debtor as to.*—An insolvent debtor who has not determined to make an assignment may pay or prefer one creditor to the exclusion of another, but after he has determined to make an assignment for the benefit of his creditors, any act or proceeding of his by which, of his own motion, he confers a preference upon one creditor over another will be treated as a part of the assignment, and held to be an unlawful preference, and void.

5. SAME—*Preferences After Assignment Has Been Decided on—Rights of Creditor as to.*—The statute in regard to voluntary assignments is not intended to regulate the act of the creditor, and he may, notwithstanding the statute, if he does not know that his debtor contemplates making an assignment, take security for his debt in good faith and enforce the same, and if he procures a preference over the assignment by his diligence and without collusion with his debtor, a subsequent assignment will not affect his security.

6. COUNTY COURTS—*Equitable Jurisdiction of.*—While the county courts of this State do apply equitable principles in certain matters, including assignments, when acting within their jurisdiction, they are not courts of equity, and do not possess general equitable jurisdiction, even in the matter of assignments.

Petition, in assignment proceedings. Appeal from the County Court of Henry County; the Hon. A. R. MOCK, Judge, presiding. Heard in this court at the December term, 1897. Reversed and remanded, with directions. Opinion filed May 23, 1898.

ARTHUR KEITHLEY, attorney for appellant.

CHARLES K. LADD and HAND & HAND, attorneys for appellee.

MR. JUSTICE DIBELL DELIVERED THE OPINION OF THE COURT.

The Cambridge Co-operative Store, a corporation, was running a general store at Cambridge, in Henry county, and on Wednesday, October 20, 1897, was indebted to Oakford & Fahnestock, a Peoria corporation engaged in the wholesale grocery business, in the sum of $1,545.49, upon an open account. George P. Millard, treasurer of Oakford & Fahnestock, came to Cambridge on that day for the purpose of getting payment of this account or security therefor. Elm, the secretary and manager of The Store, offered to pay $400 the following Saturday, but Millard refused the offer, as more than two-thirds of the account was past due. Millard insisted on some arrangement of the entire account, and proposed bankable paper secured by the stockholders. Elm took him before the board of directors then in session, to whom he made the same proposition, and it was refused. Then Millard asked where the car of flour was that Oakford & Fahnestock had recently sold The Store, amounting to about $700, and was told it was in the warehouse. Whether he first asked the company to turn that over and offered to take it on the account at the price at which it had been sold, or whether the president first suggested that he take it back on the account, is left in some doubt, but it is clear Millard was seeking payment or security and

that he made the inquiry where the car of flour was with a view to seeing whether he could not obtain the benefit thereof on his claim. The president told him The Store would be glad to have him take that car of flour on the account. Millard then inquired about a car of salt The Store had recently bought, and it was finally arranged between Millard and the directors, that Millard would take at the invoice price, as payment on the account he was seeking to collect, all unbroken packages of goods in the warehouse and cellar, being the goods which had not been opened and placed upon the shelves of the store for sale. Millard told the directors if those goods did not cover the bill, he should expect a personal indorsement for the remainder. The manager then went with Millard and they examined the goods in the warehouse and cellar and made up a list of the unbroken packages which Millard would so take, amounting at the invoice price to $945.49; and Elm, in the name of The Store, gave Oakford & Fahnestock a bill of sale of said property. Millard credited that sum upon the account, moved a part of the goods selected in the cellar into the warehouse and set the rest of the cellar goods apart from the other goods, and locked up the warehouse containing nearly all the goods so bought, and kept possession of the key. Elm turned out this property and made this bill of sale in obedience to the oral instructions of the directors at said meeting. By this time the meeting was over and the directors had gone away. Millard went to two directors and asked for their personal indorsement for the remaining $600, but failed to get it. He then made an arrangement with the president of the company for a chattel mortgage of the remainder of the goods and fixtures in the grocery department to secure the remaining $600. The president then prepared a paper consenting to the bill of sale already executed, and consenting that the manager should give a mortgage on all the groceries in the store to secure the balance due Oakford & Fahnestock. This paper was taken to and signed by each director. Elm then executed and delivered to Millard a chattel mortgage on the

goods, wares and merchandise, furniture and fixtures in the grocery department of the store, and Millard took possession at once, obtained and kept the key to one of the doors of the store, put up notices on the grocery side of the store that the groceries were the property of Oakford & Fahnestock, hired two clerks and put them in charge. Millard also induced Elm to assign to him as collateral security a note held by The Store secured by a second mortgage on real estate. The president ratified this act and Millard carried away these securities. This all occurred on October 20th. On October 21st, 22d and 23d, these clerks hired by Millard sold part of said groceries, they being exclusively in charge of the grocery department, and they realized $425 from said sales, leaving unpaid $175 of the debt, and the expenses of so foreclosing the chattel mortgage. On Saturday evening, October 23d, The Store made an assignment for the benefit of creditors, and the assignee took possession of all the goods so sold to Oakford & Fahnestock, and of all the goods mortgaged to that company which had not been sold by it. Oakford & Fahnestock petitioned the County Court, having jurisdiction of said assignee, for an order requiring him to return said property to Oakford & Fahnestock. The assignee and certain alleged creditors who were not parties to the petition answered, setting up that these transactions all took place after The Store decided to make an assignment for the benefit of creditors, and were unlawful preferences and void. The assignee filed a cross-petition asking that Oakford & Fahnestock be required to deliver said note to the assignee and to pay him said sum of $425. Proofs were heard and an order was entered finding that Oakford & Fahnestock never took possession of the goods; that the manager executed the bill of sale and chattel mortgage and delivered the note and mortgage without authority; and that at the time The Store was insolvent and had determined to make an assignment; and that these were unlawful preferences. Oakford & Fahnestock were ordered to deliver to the assignee the note and mortgage; the assignee was ordered to retain possession of all the property

he had seized; and it was ordered that if Oakford & Fahnestock should file a claim against the estate, and it should be allowed and any dividends ordered paid thereon, the $425 should be applied on said dividends, and so much, if any, of said $425 as was not covered by the dividends allowed Oakford & Fahnestock, should be paid by Oakford & Fahnestock to said assignee. From this order Oakford & Fahnestock appeal.

Some parts of this order require but little discussion. The arrangement to sell to Oakford & Fahenstock at the invoice price all unbroken packages of groceries Millard would take, and to apply them as payment on the account, was made at a meeting of the directors at which they were all present. The bill of sale merely carried out that arrangement, and even that was ratified in writing by each director. It is difficult to see what further authority could have been given the manager to execute the bill of sale. True, the board of directors made no record of their action, but their failure to do so can not affect the rights of Oakford & Fahnestock. The chattel mortgage was ratified in writing by each director, and we have no doubt it bound the corporation. The assignment of the note and delivery of the note and mortgage to Oakford & Fahnestock as collateral security were the acts of the secretary and manager, with the approval of the president. We do not doubt these officers could thus bind the corporation in a matter relating to the corporate business. Further, we think Millard had complete and exclusive possession of the goods in the warehouse, and that his possession of the groceries in the store and the goods left in the cellar was ample for all the purposes of this case. In all these respects the order is manifestly erroneous.

The assignee had never reduced the note and mortgage to his possession. They were in the exclusive possession of Oakford & Fahnestock before the assignment was made, and are still. The $425 had been received by Oakford & Fahnestock from the sale of the groceries before the assignment. Assets which have not been reduced to possession

by the assignee are not within the jurisdiction of the County Court. Preston v. Spaulding, 120 Ill. 232; Ide v. Sayer, 129 Ill. 230. An effort is made to support the order as to the note, mortgage and money, on the principle that when a court of equity obtains jurisdiction for one purpose it will proceed to do complete justice between the parties. The County Court does apply equitable principles in certain matters, including assignments, when acting within its jurisdiction, but it is not a court of equity and does not possess a general equitable jurisdiction, even in the matter of assignments. Moreover, in this case Oakford & Fahnestock had not invoked the jurisdiction of the County Court in reference to the note, mortgage and money, and had not invoked the exercise of an equitable jurisdiction on any subject. Its petition set up facts showing, as it claimed, that it was the legal owner of the groceries covered by its bill of sale and legally entitled to the possession of the groceries covered by its chattel mortgage and remaining unsold; that at the time of the assignment it was in possession of all said property; that the assignee wrongfully seized said goods and refused to surrender them to Oakford & Fahnestock on demand, and the petition only asked that the court order its officer to surrender these goods to the owner. As the assignee was the officer of the court, and his possession the court's possession, Oakford & Fahnestock could not replevy the goods (Hanchett v. Waterbury, 115 Ill. 220, Farwell v. Crandall, 120 Ill. 70), but it only asked the enforcement of its alleged legal rights. The petition did not confer any jurisdiction upon the County Court to adjudicate upon the ownership of the notes, mortgage and money. The County Court on these subjects was without jurisdiction.

The assignee sought to show that at the time this arrangement with Millard was made The Store was insolvent and that the several directors had determined to make an assignment. The proof on this subject was conflicting, and several of the directors were driven to so testify by very leading questions which put answers to that effect into their mouths.

These questions were objected to. The court made no ruling but permitted the questions to be answered. We disapprove this unwarrantable use of leading questions.

When Millard arrived in Cambridge the directors were in session and had before them a statement of their financial condition which they showed Millard, but it is not in evidence, nor is the result it showed stated. Probably the concern was insolvent, though one director when allowed to answer without a leading question said the board had not reached that conclusion. The directors had determined not to become individually responsible further for the debts of the concern. They had among themselves orally reached the conclusion that they would not continue in business much longer, and had talked of having a receiver appointed. They had not taken any formal action. When Millard reached the meeting the president and their attorney had gone to invite a certain party to act as receiver. After these returned and after the sale to Oakford & Fahnestock had been authorized and Millard had left the board meeting, the directors adopted and entered of record a resolution to appoint a receiver to close out the business, pay the debts and collect the bills, and recommending John Fischer for receiver. It is not clear how they expected the receiver to be appointed, and there was some evidence tending to show they had talked of an assignment. It is reasonably clear that at that meeting their oral conclusion was that they would soon cease doing business and would put their property into the hands of some one to act for them, collect the outstanding bills and pay the debts of the concern. In the afternoon of Saturday, October 23d, they met again and adopted a resolution that Fischer be appointed assignee, and then made an assignment. When Millard bought this property and obtained the security, and took possession of the property and security, he had no knowledge or information that The Store contemplated an assignment. He did not know it was insolvent. He did think that as the account of his company was very large and much of it past due, there was danger that if he did not get it paid or

Oakford & Fahnestock v. Fischer.

secured it might lose its claim; but there is nothing to show that he feared it might lose it by The Store making an assignment, which in fact would have secured a part, at least, of its claim; but the fear seems rather to have been that some other creditor might, by execution or attachment or otherwise, seize the property to the exclusion of Oakford & Fahnestock. Millard exercised the ordinary diligence of a creditor, and without any misrepresentation, over-persuasion or undue influence of any kind, by his own active exertions obtained payment of part of his claims in goods at a fair price, and the manual possession of security for the balance, three days before the assignment was made, and without any knowledge on his part that an assignment was contemplated. Under such circumstances can the creditor retain his security?

An insolvent debtor who has not determined to make an assignment may pay or prefer one creditor to the exclusion of another. After the debtor has determined to make an assignment for the benefit of his creditors any act or proceeding of the debtor by which of his own volition he confers a preference upon one creditor over another will be treated as a part of the assignment and held an unlawful preference and void. A diligent creditor has the right to seek payment or security, and to retain all advantage he can secure, when he is not acting in collusion with his debtor. These rules are well settled; the controversy arises over their application. It is insisted by the assignee here, that although the creditor may thus exercise due diligence and obtain liens and securities, yet after the debtor has determined to make an assignment the diligent creditor (though he is ignorant of the intention to assign) can hold no securities which require the act or co-operation of the debtor; that is to say, if he already possesses a judgment note or a chattel mortgage, he may enforce the security, or if he can find grounds for attachment he may attach, but that he can not obtain from the debtor who secretly contemplates an assignment a judgment note, or a chattel mortgage, or the delivery of goods in payment or as secu-

rity, or any other security which requires the act of the debtor to make it available to the creditor. This subject has been touched upon by our Supreme Court several times. In Hanford Oil Co. v. First National Bank, 126 Ill. 584, the court dwells upon the fact that the security there obtained "was due to no diligence on the part of the creditor;" that "the preference obtained by appellee was not by reason of any diligence on its part, but resulted solely * * * from the affirmative act of the debtor." In Home National Bank v. Sanchez, 131 Ill. 330, the court said : "It is to be observed, as distinctly held in the case last cited (Preston v. Spaulding, 120 Ill. 208), the statute is not intended to regulate the act of the creditor. He may, notwithstanding the statute, if he does not know that his debtor contemplates making an assignment, take a mortgage, power of attorney to confess judgments, or other securities for his debt, in good faith, and enforce the same. And if he procures a preference over the assignment by his own diligence, and without collusion with the debtor, the subsequent assignment will not affect his security. The law gives a creditor the advantage he may secure by his superior diligence, where he is guilty of no fraud or unlawful confederation or collusion to avoid the provisions of the statute." It will be noticed that the mortgage and power of attorney which in the above case it is said the creditor may secure in good faith where he does not know the debtor contemplates making an assignment, requires the action and signature of the debtor. In Plume & Atwood Mfg. Co. v. Caldwell, 136 Ill. 163, it was held that the assignment act "has no application to the conduct of creditors except in case of collusion with debtors;" and in that case the court dwells upon the fact that the proof failed to show any collusion between the bank or its officers and the insolvent corporation or its officers. In Schwartz v. Messinger, 167 Ill. 474, Hornstein made an equitable assignment of $2,000 of the proceeds of a contract to a creditor five days before he made a general assignment. The court there said : "As to the creditor, he may, if he does not

know that his debtor contemplates making an assignment, take a mortgage or other security for his debt in good faith and enforce the same."

We are of opinion that the principles above stated are applicable to this case. The debtor had not given Oakford & Fahnestock any intimation of its condition or suggested to it to seek security. The seeking of security was the voluntary act of the creditor exercising diligence in its own concerns, and the payment and security were acceded to Millard because he pressed for it and was determined to have the matter adjusted. The debtor did no more in the way of helping him to the payment and security than is justified by the principles above laid down. There was no collusion of any kind between the debtor and the creditor. We conclude the creditor was entitled to retain the fruits of his diligence.

The order of the court below will therefore be reversed and the cause remanded, with directions to deny the prayer of the cross-petition and to grant the prayer of the petition of Oakford & Fahnestock.